IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

**ROBERT KENNETH WALKER,**

     **Plaintiff,**

**v.**                                **Case No.: 2:17-cv-02442**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 10, 11).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that

1

Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On November 15, 2013, Plaintiff Robert Kenneth Walker ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of October 21, 2013, on the basis that he was "unable to focus" and had a degenerated disc in his lower back, sciatica, severe migraine headaches, a cyst in the back of his head, high blood pressure, and gout. (Tr. at 195-208, 229). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 19). Claimant filed a request for an administrative hearing, which was held on March 25, 2016 before the Honorable David Thompson, Administrative Law Judge. (Tr. at 39-75). By written decision dated May 31, 2016, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 16-38). The ALJ's decision became the final decision of the Commissioner on February 21, 2017, when the Appeals Council denied Claimant's request for review. (Tr. at 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 8, 9). Claimant then filed a Brief in Support of Judgment on the Pleadings, (ECF No. 10), and the Commissioner responded with a Brief in Support of Defendant's Decision. (ECF No. 11). Therefore, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 34 years old at the time of his alleged onset of disability and 36 years old at the time of the ALJ's decision. Claimant completed high school and was trained in automotive service technology. (Tr. at 230). He communicates in English and previously worked as an automotive service manager, mechanic, and food deliverer. (Tr. at 62-63, 228).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative

3

Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2018. (Tr. at 21, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since the alleged onset date, October 21, 2013. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ

4

found that Claimant had the following severe impairments: "degenerative disc disease, headaches (alleged migraines), and obesity." (Tr. at 22, Finding No. 3). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 24, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except limited to occasional climbing of ramps, stairs, and ladders; no climbing of ladders, ropes and scaffolds; occasional stooping, kneeling, crouching and crawling; and must avoid concentrated exposure to noise above Level IV, and fumes, dusts, gases, unprotected heights and unprotected moving machinery.

(Tr. 24-31, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work. (Tr. at 31, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 31, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1979 and was defined as a younger individual on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 31, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, (Tr. at 31-32, Finding No. 10), including work as an inventory clerk, service writer, or sales employee at the light exertional level, or personnel interviewer or time

keeper at the sedentary exertional level. (Tr. at 32). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and thus, he was not entitled to benefits. (*Id.*, Finding No. 11).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant asserts that the Commissioner's decision is unsupported by substantial evidence because the ALJ failed to properly consider the impact of his migraine headaches. (ECF No. 10). Specifically, Claimant contends that the ALJ's step three analysis was conclusory and failed to identify the specific listing to which Claimant's medical findings for his migraine headaches should have been compared. (*Id.* at 12-15). In addition, Claimant states that the ALJ's pain analysis and credibility findings were not in compliance with applicable regulatory and case law, because the ALJ relied almost exclusively on objective evidence to discredit Claimant's allegations of disabling pain and did not demonstrate how Claimant's statements were inconsistent with the evidence. (*Id.* at 6-12). Finally, within his challenge to the credibility analysis, Claimant contends that "the ALJ declined to provide any limitations in [Claimant's] RFC assessment that related to the obvious absenteeism or the need for additional rest breaks that would occur as a result of [Claimant's] migraine headache episodes." (*Id.* at 12).

In response to Claimant's arguments, the Commissioner argues that the ALJ complied with all applicable laws, provided an exemplary pain and credibility analysis, and thoroughly analyzed all of the evidence concerning Claimant's migraine headaches. (ECF No. 11).

## V.    **Relevant Evidence**

The undersigned has considered all of the evidence of record, including

6

documentation of medical examinations, treatment, evaluations, and statements. The information that is most relevant to Claimant's challenge is summarized as follows.

### A. Treatment Records

In January 2011, several years prior to Claimant's alleged onset of disability and while he was still employed, Claimant's primary care provider, Amado Gabriel Maijub, M.D., Ph.D., referred him to PARS Neurosurgical Associates, Inc. ("PARS") for an evaluation of headaches, which reportedly began three weeks earlier. (Tr. at 505). During Claimant's subsequent visit with Dr. Maijub a few months later on March 22, 2011, migraine headaches were included in Claimant's list of complaints and assessed conditions, but Claimant denied having a headache at the time of the visit. (Tr. at 308-09). He was alert, fully oriented, and in no acute distress. (*Id.*). His mental status and eye movements were normal. (*Id.*). Dr. Maijub prescribed Topamax to treat Claimant's headaches. (Tr. at 309).

Claimant returned to PARS for follow-up on March 28, 2011. He advised nurse practitioner, Sheena Geer, that his symptoms had improved 50 to 75 percent. He had suffered only two migraines since his initial appointment in January. (Tr. at 510). Claimant continued to take Topamax. (*Id.*).

On December 20, 2011, Claimant saw a neurologist, Jay A. Bauerle, M.D. Claimant reported ongoing headaches, but stated that he had them only once or twice a week as compared to the daily headaches that he previously experienced. (Tr. at 539). Claimant was taking Topamax twice per day, which was reducing the frequency of his headaches, and he was taking Imitrex at the onset of a headache, which was effective for acute treatment. (Tr. at 539, 541). Claimant noted that medication resolved his headaches in approximately one hour. (Tr. at 539). He added that numbness and

tingling in his fingers and toes, which were a side effect of Topamax, had much improved. (*Id.*). On his review of systems, Claimant reported headaches, but denied vision issues, dizziness, nausea, vomiting, weakness, or difficulty with memory or concentration. (Tr. at 540-41). Dr. Bauerle's differential diagnosis included migraines without aura, mention of intractable migraine, or status migrainosus (a headache lasting more than 72 hours). (Tr. at 541). Claimant was continued on Topamax and Imitrex. (*Id.*).

Claimant saw Dr. Maijub again on April 17, 2012. He denied having a headache; was alert, fully oriented, and in no acute distress; and his mental status and eye movements were normal. (Tr. at 453-54). The following month, on May 7, 2012, Claimant again followed-up at PARS. On a review of systems, Claimant reported headaches, but denied double vision or other vision issues, dizziness, nausea, vomiting, loss of balance, lack of concentration, or memory difficulties. (Tr. at 516). His headaches were improving. (Tr. at 517).

Claimant next saw Dr. Bauerle on June 12, 2012. Claimant still reported having headaches once or twice per week that resolved in approximately one hour after taking medication. (Tr. at 543). He reported photophobia, but denied vision changes, dizziness, nausea, vomiting, weakness, difficulties with memory, or lack of concentration. (Tr. at 543-45). He reported a small decrease in headache frequency and intensity with an increased dosage of Topamax. (Tr. at 543). Claimant also stated that one dose of Imitrex was generally effective as an abortive treatment. (*Id.*). Claimant denied having any difficulty or intolerance with either medication. (*Id.*). Although Claimant showed some improvement, Dr. Bauerle felt that Claimant's reported migraines were still too frequent. (Tr. at 545). Thus, he increased Claimant's

8

dosage of Topamax and advised him to take Aleve in conjunction with Imitrex for acute headaches. (Tr. at 546).

On August 8, 2012, Claimant saw physician's assistant, Brian P. Showalter, at PARS. (Tr. at 520). Claimant's headaches were still improving. (Tr. at 520, 522). His gait was normal, without suggestion of weakness, and he did not grimace or show obvious signs of pain. (Tr. at 522). Similarly, at his October 3, 2012 visit with Dr. Maijub, Claimant denied having a headache, was alert, fully oriented, and in no acute distress. (Tr. at 297). Claimant followed up with Dr. Bauerle later in the year on December 11, 2012. (Tr. at 547). The frequency of his headaches had reduced to a severe headache every other week as opposed to his prior reports of one to two headaches per week. (*Id.*). Claimant was taking Topamax daily and Imitrex as needed. (*Id.*). He stated that Imitrex alleviated his headaches, and he denied symptoms of photophobia, phonophobia, nausea, dizziness, loss of balance, or vision disturbances. (*Id.*). Nonetheless, given that Claimant continued to have headaches, Dr. Bauerle again increased Claimant's dosage of Topamax. (Tr. at 549).

Claimant saw Dr. Maijub on May 1, 2013. Like his prior visits, his list of complaints and assessed conditions included headaches, although he denied having a headache at the time of the visit and was alert, fully oriented, and in no acute distress. (Tr. at 294). The following month, on June 11, 2013, Claimant saw Dr. Bauerle. (Tr. at 551). Claimant reported three to four headaches per month, as opposed to his previous report of four to eight headaches per month and noted that he was taking his medications without difficulty. (*Id.*). Claimant stated that he vomited once since his last visit. (*Id.*). Claimant's diagnosis remained the same, but because he was still requiring Imitrex for acute headaches on a fairly frequent basis, Dr. Bauerle again

increased Claimant's dosage of Topamax. (Tr. at 553). Claimant was accompanied by his wife and children at the visit; he was in no acute distress, with normal attention and gait; and his affect was appropriate. (Tr. at 551, 553).

On July 15, 2013, Claimant saw Mr. Showalter at PARS. Claimant reported that he was still having severe headaches, but they were tolerable with medication. (Tr. at 524). On a review of systems, Claimant reported dizziness and lightheadedness, but denied loss of balance. (Tr. at 526). Claimant was neurologically intact, and his brain MRI was stable. (Tr. at 527). The plan was for Claimant to continue medical management of his headaches. (*Id.*).

On October 28, 2013, one week after his alleged onset of disability, Claimant returned to Mr. Showalter's office. Claimant stated that his headaches had become more severe, making it hard for him to get up in the morning, and added that he had to quit his job because of headaches. (Tr. at 529). Mr. Showalter referred Claimant to the Cleveland Clinic Department of Neurology due to his reports of severe, debilitating headaches. (Tr. at 532). Prior to the appointment in Cleveland, Claimant saw Dr. Bauerle on October 31, 2013. Claimant stated that his symptoms were worse, complaining that he had experienced a constant headache for the past three weeks. (Tr. at 557). He advised that he had recently resigned from his job due to his headaches and rated his pain as 5 out of 10. (*Id.*). Claimant reported nausea and vomiting, but denied visual disturbances. (Tr. at 557, 559). Since Claimant's previously effective medications appeared to no longer be working, Dr. Bauerle switched Claimant to Verapamil. (Tr. at 560).

On November 27, 2013, Claimant saw nurse practitioner, Christopher H. Wheeler, at PARS. (Tr. at 583). Claimant reported having headaches four to five times

per week, but denied any additional symptoms. (*Id.*). Due to Claimant's complaints of almost daily headaches without aura, anesthesiologist Pete Pantelidis, M.D., recommended Botox treatments, but he needed to confirm whether they would be covered by Claimant's insurance. (Tr. at 586).

On January 2, 2014, Claimant was seen by neurologist, Stewart J. Tepper, M.D., at the Cleveland Clinic pursuant to Mr. Showalter's referral. (Tr. at 592). Claimant reported a history of intermittent headaches in his adolescence, but indicated that he had developed a continuous headache beginning in January 2011. (Tr. at 592). He stated that he had nine severe headaches per month for which he took Imitrex. The Imitrex provided six hours of relief, but did not completely eliminate the pain. (*Id.*). Dr. Tepper's impression was that Claimant had new daily-persistent headache (NDPH). (Tr. at 596). He offered to admit Claimant to a three-week Interdisciplinary Method for Assessment and Treatment of Daily Headache (IMATCH) program upon approval by a psychologist, who acted as a gatekeeper. (*Id.*). Claimant was to advise the clinic if he wished to participate in the program. (*Id.*).

On March 11, 2014, Claimant saw nurse practitioner, Lori Dennis. (Tr. at 622). Claimant reported having headaches all day, every day, despite taking Verapamil, Zonegran, and Imitrex as needed. (*Id.*). He noted that he quit his job due to back pain and headaches. (*Id.*). Claimant's assessed conditions included "headache disorder." (Tr. at 624). Ms. Dennis discontinued Claimant's Verapamil, as it was potentially causing high levels of prolactin, and substituted Propranolol in its place. (Tr. at 624-25). Ms. Dennis also referred Claimant for a sleep study to determine if he had sleep apnea. She noted that treatment for sleep apnea could also help Claimant's headaches. (Tr. at 625).

11

On April 8, 2014, Claimant saw Ms. Dennis for a monthly follow-up appointment. He stated that his headaches were the same after switching to Propranolol, but he also reported that he felt "much better though" after being on Propranolol. (Tr. at 628). His headaches were noted to be moderate and improving as opposed to his prior visit when they were noted to be severe. (Tr. at 622, 628). Claimant's Propranolol was increased. (Tr. at 630). He was also continued on Imitrex and Zonegran. (*Id.*).

On May 12, 2014, Claimant stated to Ms. Dennis that his headaches were about the same, but he was sleeping well. (Tr. at 641). His sleep study was postponed, and the Propranolol dosage was increased. (Tr. at 641-42). A few days later, on May 15, 2014, Claimant saw Dr. Bauerle and stated that he had a headache every day and mostly in the morning. (Tr. at 651). Nevertheless, Claimant reported some improvement in his headaches from Propranolol. (*Id.*). Claimant noted that he could not participate in the IMATCH program recommended by Dr. Tepper, because he cared for his children while his wife worked and could not be away from home for three weeks. (*Id.*). Claimant denied vision issues, dizziness, nausea, vomiting, weakness, or difficulties with concentration or memory. (Tr. at 653). Claimant was to call the office in one to two weeks to report on his progress with the recently increased dosage of Propranolol by his primary care provider; if necessary, the dosage could be increased. (Tr. at 654). Claimant was also to continue taking Zonegran, which could be tapered off if effective headache control was achieved with Propranolol. (*Id.*).

On November 25, 2014, Claimant saw Charles W. Reyes, M.D., at Dr. Bauerle's office. (Tr. at 662). Claimant stated that he continued to have intermittent headaches. (*Id.*). His brain MRI and sleep study were normal. (*Id.*). Claimant reported that he had

woken up with throbbing pain in the frontal area of his head a little over a week earlier, which made him nauseous to the point that he vomited. (*Id.*). He took Imitrex, which helped his symptoms. (*Id.*). Claimant reported headaches, nausea, and vomiting, but denied vision issues or weakness. (Tr. at 664). Dr. Reyes assessment remained migraine without aura, mention of intractable migraine, or status migrainosus. (Tr. at 665). Claimant was noted to be doing well on Zonegran, Imitrex, and a beta blocker. (*Id.*).

On March 24, 2015, Claimant presented as a new patient to primary care provider, Jessica M. Shreve, M.D. (Tr. at 676). He was feeling well and his headaches were controlled on his current regimen. (Tr. at 677). Claimant did not have any double vision, nausea, vomiting, dizziness, or weakness. (*Id.*).

Claimant followed up with Dr. Reyes on July 28, 2015. (Tr. at 666). Claimant stated that he still had daily headaches, but the pain was less intense than before he started medication. (*Id.*). He reported having 15 to 20 headaches per month, some which he described as very severe. (Tr. at 669). He was on Imitrex, Zonegran, and Inderal as needed. (*Id.*). Since Claimant declined to participate in the three-week outpatient program at the Cleveland Clinic, and his insurance did not cover Botox treatments, Dr. Reyes planned to refer Claimant to neurologist, David Watson, M.D., at WVU Headache Center. (*Id.*).

Claimant saw Mandy Hatfield, M.D., at Dr. Watson's office on December 7, 2015. Dr. Hatfield recommended that Claimant's primary care doctor replace Claimant's Propranolol with Nortriptyline, continue Claimant on Zonegran and Imitrex, begin over-the-counter magnesium supplements, and discuss Botox therapy. (Tr. at 705). Claimant had monthly follow-up appointments with Dr. Shreve on

January 14 and February 26, 2016. He was still feeling well with no headache, vision issues, nausea, vomiting, dizziness, or weakness. (Tr. at 696, 698, 700). Neither headaches, nor migraines, were listed among his assessed conditions, although he still had active prescriptions for Imitrex and Zonegran. (Tr. at 698, 700).

On March 28, 2016, Claimant saw physician's assistant, Casey L. Smith, at PARS. Claimant stated that he did not notice any improvement after the medication changes that Ms. Hatfield made in December. (Tr. at 738). He complained of double vision, headaches, and dizziness, but denied nausea or vomiting. (Tr. at 740). Claimant was to follow-up with Dr. Watson regarding Botox injections. (Tr. at 741). However, Claimant saw Dr. Shreve the following day, on March 29, 2016, and was noted to be feeling well with no headache, vision issues, nausea, vomiting, dizziness, or weakness. (Tr. at 718).

On April 8, 2016, Claimant returned to Dr. Watson's office. He reported that Imitrex tablets worked "ok" for small headaches; they did not completely resolve the pain, but dulled it enough that he could function. (Tr. at 707). He used the Imitrex injections for severe headaches, which completely eliminated the pain. (*Id.*). He had no side effects from the medications. (*Id.*). Dr. Watson's diagnosed Claimant with intractable chronic migraine without aura and without status migrainosus. (Tr. at 708). Claimant was to continue Zonegran and Inderal for prevention of headaches. Neurontin was also added as a preventative. (*Id.*). Claimant was to continue using the Imitrex injector for severe headaches and the tablets for less severe headaches. (*Id.*). He could discontinue magnesium and pamelor, because they had not helped with sleep or headaches. (*Id.*). Claimant was also approved for one Botox session. (Tr. at 709).

On May 17, 2016, Claimant had Botox injections for his chronic headaches at the WVU Headache Center. (Tr. at 727). Shortly thereafter, Claimant saw Dr. Shreve on May 26, 2016. (Tr. at 713). He did not have a headache and denied having any vision issues, nausea, vomiting, dizziness, or weakness. (Tr. at 714).

On October 20, 2016, Claimant saw Dr. Watson and reported that his headaches had improved slightly. (Tr. at 731). He was without a headache half of the time. (*Id.*). He reported 15 headaches in a month, three of which were severe. (*Id.*). He was taking Propranolol and Zonegran for prevention and Imitrex tablets or injections as needed. (*Id.*). His response to abortive medications was good. (*Id.*). Claimant was to continue Zonegran and Imitrex. Effexor was added for prevention of headaches. (Tr. at 732).

On November 28, 2016, Claimant saw Ms. Smith at PARS. He stated that the single treatment of Botox injections decreased his headaches for one to two months. (Tr. at 749). His brain MRI taken several months earlier still showed no significant changes and no acute findings. (*Id.*). On his review of systems, Claimant reported headaches, but denied vision issues, dizziness, nausea, vomiting, weakness, or other neurological issues. (Tr. at 751).

### B. *Evaluations and Opinions*

On February 10, 2014, Claimant had a mental status examination by consultative psychologist Amynda Rhodes, Psy.D., in connection with his claim for Social Security benefits. (Tr. at 603). Claimant stated that his daily routine involved waking and getting his children ready for school at 6:45 a.m., then lying back down until his younger children awoke at 8:30 a.m. (Tr. at 605). He fed his youngest children breakfast, tried to clean the house as much as he could, and tried to play with the children until nap time. (*Id.*). When his older children returned from school, he helped

them with homework. He and his wife made dinner and spent the evening trying to get the children ready for bed and for school the next day. (*Id.*). Claimant was able to shop for groceries, bathe himself, and manage money without difficulty. (*Id.*). He enjoyed watching Nascar races and playing outside with his children in the summer. (*Id.*). Dr. Rhodes felt that Claimant had no difficulty understanding, remembering, or carrying out instructions, or maintaining attention and concentration until his recent health problems; thus, Dr. Rhodes found that some of Claimant's difficulty concentrating might result in errors or mistakes in his work that was not reflective of his true abilities. (Tr. at 608). Claimant appeared to possess a baseline ability to attend to tasks without difficulty, but anxiety related to his health difficulties might limit his ability to maintain attention and concentration for long periods of time. (Tr. at 609). Claimant had minimal difficulty in responding appropriately to supervision and co-workers in a work setting. (*Id.*).

On February 26, 2014, Aracelis Rivera, Psy.D., evaluated Claimant's mental RFC based upon a review of Claimant's records, including the results of his consultative examination. Dr. Rivera opined that Claimant had mild restrictions in activities of daily living and moderate restrictions in social functioning and maintaining concentration, persistence, or pace. (Tr. at 81). Dr. Rivera concluded that Claimant could perform simple repetitive tasks to some mildly complex tasks without fast paced or strict production standards and would function best in settings with limited interaction with the general public and infrequent changes in duties. (Tr. at 85-86). Dr. Rivera found Claimant to be only partially credible, noting that he alleged problems with focus, but his mental status examination showed adequate attention and concentration. He also reported memory problems, but had never left food on the stove, left the water running,

or forgotten how to get home; also, Claimant drove to the grocery store, performed chores, managed money, cared for his own needs, and provided daily care for his two minor children aged one and two. (Tr. at 82, 86).

On March 13, 2014, Abraham Mikalov, M.D., assessed Claimant's physical RFC based upon a review of the records. He opined that Claimant could perform light level exertional work with frequent balancing and occasional postural activities, except he could not climb ladders, ropes, or scaffolds, or crawl. (Tr. at 82-83). Claimant needed to avoid concentrated exposure to noise, fumes, and hazards. (Tr. at 84). Gary Hinzman, M.D., affirmed this RFC assessment on May 24, 2014. (Tr. at 110-12).

On May 27, 2014, Cindy Matyi, Ph.D., evaluated Claimant's mental RFC at the request of the SSA. Based on Claimant's records, Dr. Matyi agreed that Claimant could comprehend, remember, and carry out simple (1-2 step) and occasional complex (3-4 step) instructions. (Tr. at 112). He could maintain attention, make simple decisions, and adequately adhere to a schedule, but needed flexibility of time limits and production standards. (Tr. at 113). Dr. Matyi believed that Claimant had some interpersonal struggles, but could relate adequately on a superficial basis in an environment with no public contact, minimal interaction with co-workers, and no over-the-shoulder supervisor scrutiny. (*Id.*). She added that Claimant's symptoms would increase in the face of perceived stressors, but Claimant could adapt as long as his duties were routine, predictable, well-explained, and introduced slowly. (Tr. at 114).

### C. Claimant's Statements

On January 15, 2014, Claimant spoke with Ashley Rogers in connection with his applications for Social Security benefits. Claimant reported having migraines for two or three years. (Tr. at 238). He stated that they were so intense they prevented him

17

from doing "paper work" at his job, forcing him to quit. (*Id.*). Claimant further asserted that his migraines remained at 10 on a 10-point pain scale, and he took three medications for them, but the medications did not really help. (*Id.*). Claimant also reported issues with focus over the past four months, but confirmed that he had never forgotten how to get home, left food on the stove, or left water running. (*Id.*). Claimant stated that in a typical day he awoke around 6:30 a.m. and helped send his school-aged children off to school. (Tr. at 238). He then remained at home to care for his younger children, aged one and two years old; he watched television, made meals for the children, and interacted with them. (*Id.*). Claimant drove to the grocery store every two weeks and did chores as much as he could until he started "hurting." (*Id.*). He denied having friends, but stated that he had no problems getting along with others. (*Id.*). He could manage money and take care of his own needs. (*Id.*).

Claimant completed monthly headache diaries in June and July 2014, December 2015, and January 2016. (Tr. at 256-57, 261-62). In June 2014, Claimant recorded four days of severe headaches, 10 days of moderate headaches, 4 days of mild headaches, and 10 days without a headache. (Tr. at 256). During his severe headaches, Claimant reported nausea/vomiting, light sensitivity, a couple of instances of vertigo, and one instance of double vision. (*Id.*). Claimant also reported light sensitivity on nine days and dizziness on two days when he had mild to moderate headaches. (*Id.*). In July 2014, Claimant reported six days of severe headaches, seven days of moderate headaches, three days of mild headaches, and fourteen days of no headaches. (Tr. at 257). He again reported light sensitivity, one instance of dizziness, and three instances each of double vision and nausea/vomiting during his severe headaches. (*Id.*). In December 2015, Claimant reported two severe headaches, eight moderate headaches,

ten mild headaches, and 11 days without a headache. (Tr. at 262). Claimant again reported light sensitivity, vision symptoms, one instance of double vision, two instances of dizziness/vertigo, and other symptoms. (*Id.*). In January 2016, Claimant reported 17 days of headaches, four of which were severe, seven were moderate, and five were mild; he had 14 headache-free days that month and no longer took Propranolol. (Tr. at 261).

On March 25, 2016, Claimant testified at the administrative hearing that he lived with his wife, who was employed, and his five children, ages 3, 5, 7, 9, and 10. (Tr. at 45-46). Claimant drove 10 to 15 miles per week and could take care of his personal hygiene. (Tr. at 54). He stated that he quit working as an automotive center manager at Sears in October 2013 due to "severe migraines" and low back pain. (Tr. at 48). Claimant stated that he went to work "sick with nausea" and could barely get out of bed at the time that he stopped working. (*Id.*). When asked if his current medications were effective, he stated that they were "maintaining everything" and identified that the only side effect was drowsiness. (Tr. at 49-50). Claimant testified that his migraine pain averaged a 4 out of 10 on good days and an 8 or 9 out of 10 on bad days. (Tr. at 52). He stated that he usually had about 9 bad days per month. (Tr. at 53). The headaches were in the front part of his head and made him sensitive to light; when he had a headache, he had to dim the lights if he was inside, wear sunglasses if he was outside or driving, or, if the headache was severe, he had to cover his eyes and lie down. (Tr. at 55, 57). Claimant stated that his headache medication took 30 to 45 minutes to work, but did not usually work with very severe migraines. With severe headaches, he gave himself an Imitrex injection. (Tr. at 53, 55). Claimant reported double vision with headaches two to three times per month, dizziness with severe headaches once or twice per month,

and stated that he had some weakness after headaches and it took him a couple of hours until he was completely back to normal. (Tr. at 55-56, 60). Claimant testified that a Bayer aspirin would take care of the mild headaches that he experienced the most frequently. (Tr. at 56). He had nausea with severe headaches and sometimes with moderate headaches; it varied, but he sometimes had nausea with headaches three or four times per month. (Tr. at 57, 59). He vomited twice from headaches the prior month, but had not vomited in the month of the administrative hearing. (Tr. at 59). Claimant stated that no medication completely resolved his headaches, and his headaches interfered with activities of daily living because he usually just sat in the recliner trying to get rid of the headache. (Tr. at 57-58).

## VI.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the

decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

VII. **Discussion**

    *A. Step Three Analysis*

    Claimant argues that the ALJ erred in not identifying which specific listing under Listing 11.00 he considered; by not acknowledging Listing 11.03; and by not comparing the evidence to the listing criteria. (ECF No. 10). In support of his arguments, Claimant cites the holdings of the Unites States Court of Appeals for the Fourth Circuit ("Fourth Circuit") in *Radford v. Colvin*, 734 F.3d 288 (4th Cir. 2013) and *Fox v. Colvin*, 632 F. App'x 750 (4th Cir. 2015), which are discussed below.

    A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments that [the SSA] consider[s] to be severe enough to prevent a person from doing any gainful activity regardless of his or her age, education, or work experience." *See* 20 C.F.R. §§ 404.1525, 416.925. Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). If the claimant is unable to demonstrate that his impairments, alone or in combination, match the criteria of a particular listed impairment, the claimant may still establish disability by showing that his impairments are medically equivalent to the listed impairment.

    In this circuit, "where there is factual support that a listing could be met," the

ALJ must consider whether the claimant's impairment meets or equals the relevant listing. *Huntington v. Apfel*, 101 F.Supp.2d. 384, 390 (D. Md. 2000) (citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)). "The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* at 390-91; *see also Ezzell v. Berryhill*, 688 F. Appx. 199, 200 (4th Cir. 2017) ("When there is 'ample evidence in the record to support a determination' that the claimant's impairment meets or equals one of the listed impairments, the ALJ must identify 'the relevant listed impairments' and compare 'each of the listed criteria to the evidence of the claimant's symptoms.'") (citing *Cook*, 783 F.2d at 1172-73) (internal markings omitted).

As is the case throughout the sequential evaluation process, the ALJ must set forth the reasons for the step three determination. *See, e.g.*, *Radford v. Colvin*, 734 F. 3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling.") (citing *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984)). An ALJ's explanation is insufficient if it only states that the ALJ considered the listing of impairments and offers nothing to reveal *why* the ALJ made his or her determination. *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) ("Our circuit precedent makes clear that it is not our role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record."). Likewise, it is generally unacceptable for an ALJ to summarily conclude that a claimant does not have an impairment or combination of impairments that meets a listing. Instead, the ALJ's decision must include a discussion that applies the pertinent legal requirements of the listing to the record evidence.

22

*Radford*, 734 F.3d at 295. When evidence exists that a claimant meets a disability listing, but the evidence is rejected without discussion, '"insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings."' *Coe v. Berryhill,* No. 1:15CV1077, 2017 WL 886858, at *3 (M.D.N.C. Mar. 6, 2017) (quoting *Bailey v. Colvin,* No. 1:14CV303, 2015 WL 5227646, at *3 (M.D.N.C. Sept. 8, 2015)). While an "ALJ is not required to explicitly identify and discuss every possible listing", the ALJ "is compelled to provide a coherent basis for [the] Step Three determination." *Ezzell*, 688 F. App'x at 200 (citation omitted).

In *Radford*, the Fourth Circuit found that an ALJ's step three analysis was "devoid of reasoning" and the ALJ's summary conclusion that the claimant did not meet a listing made it impossible for a reviewing court to evaluate whether substantial evidence supported the ALJ's findings. *Radford*, 734 F.3d at 295. The Fourth Circuit explained that a full explanation by the ALJ was particularly important in Radford's case because the medical record included a fair amount of evidence supportive of his claim. In fact, there were five years of medical examinations and probative evidence strongly suggesting that Radford met or equaled the relevant listing. *Id*. Similarly, in *Fox*, the Fourth Circuit found that the ALJ erred by failing to properly explain the step three finding despite inconsistent evidence in the file, including a treating physician's numerous statements about the claimant's severe limitations, which possibly supported a finding that the claimant met the relevant listing. *Fox*, 632 F. App'x at 755 (4th Cir. 2015).

Despite the admonitions of the Fourth Circuit in *Radford* and *Fox* regarding an ALJ's duty of explanation at step three, "if the ALJ's opinion read as a whole provides

substantial evidence to support the ALJ's decision at step three, such evidence may provide a basis for upholding the ALJ's determination." *McDaniel v. Colvin*, No. 2:14-CV-28157, 2016 WL 1271509, at *4 (S.D.W. Va. Mar. 31, 2016) (quoting *Smith v. Astrue*, 457 Fed. Appx. 326, 328 (4th Cir. 2011) ("Reading the ALJ's decision as a whole, substantial evidence supports the finding at step three of the sequential evaluation process as the ALJ's analysis at subsequent steps of the evaluation are inconsistent with meeting [the listing].")). Indeed, "the ALJ need only review medical evidence once in his opinion." *Id.* at *4 (quoting *McCartney v. Apfel*, 28 F. Appx. 277, 279 (4th Cir. 2002)). Ultimately, "[a] cursory explanation in step three is satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." *Id.* (citing *Smith*, 457 Fed. Appx. at 328). Simply put, the written decision must demonstrate that the ALJ adequately performed all of the key tasks required by the sequential disability evaluation process. When the record includes conflicting evidence, or facts suggesting that the claimant might meet a listing, the ALJ's discussion is particularly important. Yet, "[i]f the court need not look beyond the ALJ's opinion to find substantial evidence supporting the ALJ's step-three determination, the ALJ's decision may be affirmed." *Marcum v. Berryhill*, No. CV 16-2297, 2017 WL 1095068, at *4 (S.D.W. Va. Mar. 23, 2017).

As noted by Claimant, there is no express listing for headaches or migraines and such conditions are routinely analyzed under the criteria for Listing 11.03 (Epilepsy). (ECF No. 10 at 14). The SSA's Program Operations Manual System ("POMS") at DI 24505.015(B)(7)(b) likewise identifies Listing 11.03 as the most "closely analogous" listed impairment to chronic migraine headaches. *McShane,* 2017 WL 440269, at *3;

*see also Mann v. Colvin,* 100 F.Supp.3d 710, 719 (N.D. Iowa 2015); *Loree v. Colvin,* No. 2:15-CV-251-JMC, 2016 WL 5107028, at *6 (D. Vt. Sept. 20, 2016) (noting that the *SSA's National Q&A 09-036 c*onfirms that "the most appropriate Listing for consideration in [headache] cases is Listing 11.03").

In January 2017, Section 11.00 was substantially revised, *inter alia,* reserving Listing 11.03. *Id.* However, at the time of the ALJ's decision on May 31, 2016, Listing 11.03 stated the following:

> 11.03 Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. *With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.*

*Id.* at § 11.03 (emphasis added). In the POMS at DI 24505.015, the SSA provides the following example of how the analysis should be performed to determine if a claimant's migraine headaches medically equal Listing 11.03:

> A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis. Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain. She has nausea and photophobia and must lie down in a dark and quiet room for relief. Her headaches last anywhere from 4 to 72 hours and occur at least 2 times or more weekly. Due to all of her symptoms, she has difficulty performing her [activities of daily living]. The claimant takes medication as her doctor prescribes. The findings of the claimant's impairment are very similar to those of 11.03, Epilepsy, nonconvulsive. Therefore, 11.03 is the most closely analogous listed impairment. Her findings are at least of equal medical significance as those of the most closely analogous listed impairment. Therefore, the claimant's impairment medically equals listing 11.03.

Courts that have discussed the proper way to evaluate headaches have provided further guidance on how migraine headaches may be examined for equivalency to Listing 11.03. *See Dunlap v. Colvin,* No. 15-CV-02139-NYW, 2016 WL 5405208, at *9 (D. Colo.

25

Sept. 28, 2016); *Plummer v. Colvin*, No. CV-13-08282-PCT-BSB, 2014 WL 7150682,

at *10 (D. Ariz. Dec. 16, 2014); *Mesecher v. Berryhill*, No. 4:15-CV-0859-BL, 2017 WL

998373, at *3–5 (N.D. Tex. Mar. 15, 2017). In *Mesecher,* the court suggested using the

following criteria:

> Migraine headaches, documented by detailed description of a typical
> headache event pattern, including all associated phenomena, e.g.,
> premonitory symptoms, aura, duration, intensity, accompanying
> symptoms, and treatment; occurring more frequently than once weekly,
> counting characteristic headache events. With (1) alteration of
> awareness, which means a condition of being inattentive, or not
> cognizant of one's surroundings and external phenomena as well as one's
> personal state or (2) significant interference with activity during the day
> that may result from, e.g., a need for a darkened, quiet room; lying down
> without moving; or a sleep disturbance that impacts on daytime
> activities.

*Id.* at 4.

Here, the ALJ appropriately compared Claimant's headaches to the

impairments described in Section 11.00 of the Listing, a section which pertains to

Neurological Disorders. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.00. The ALJ noted

that Claimant's records did not document neurological complications sufficient to

medically equal a listing. (Tr. at 24). Further, the ALJ found that Claimant's daily

activities were not limited to the extent that one would expect, given Claimant's

complaints of disabling symptoms and limitations. (Tr. at 26). The ALJ considered

Claimant's subjective complaints, such as his headache diaries and other statements,

and the ALJ also considered Claimant's assertion that he quit working due to severe

headaches. (Tr. at 25-26). The ALJ pointed out that Claimant voluntarily quit his job

and then indicated that he was looking for alternative employment after the alleged

onset date. (Tr. at 26). Also, Claimant cared for himself and his children, drove,

shopped for groceries, managed money without difficulty, and enjoyed going outside

26

and playing with his children. (Tr. at 26-27). The ALJ referenced a 2014 statement by Claimant, during his alleged period of disability, in which he described caring for his young children at home during the day while his wife worked. The ALJ pointed out the substantial physical and emotional demands involved in childcare. (Tr. at 26). Ultimately, the ALJ found that while medical records documented Claimant's significant treatment for headaches throughout the period under consideration, a close examination of the longitudinal treatment record did not substantiate the extreme symptoms and disabling functional limitations alleged by Claimant. (Tr. at 28). Specifically, the ALJ emphasized that despite Claimant's subjective complaints, he appeared to be in no acute distress at his medical appointments; he continued to care for five young children, including two that were not in school; and his headaches were described as "controlled on [his] current regimen" in March 2015. (Tr. at 28-29). The ALJ further remarked that Claimant's headache symptoms preexisted his alleged onset of disability by several years; yet despite multiple medication adjustments based on his subjective complaints, he did not receive Imitrex injections until a few months before the administrative hearing. (Tr. at 28-29). In January 2016, Claimant stated that he was feeling well and confirmed in April 2016 that his abortive medications dulled his non-severe headaches so that he could function. His Imitrex injections resolved the pain completely for the two to three times per month that he had severe headaches. (Tr. at 30). His headache diary for March 2016 indicated that he only had to give himself an Imitrex injection once that month for a severe headache. (*Id.*).

Overall, the ALJ's decision clearly articulates his rationale for finding that Claimant's headaches did not produce the associated neurological effects and phenomena, or the interference with daily activities, necessary to meet any sections of

Listing 11.00. This finding is supported by substantial evidence. As noted by the ALJ, Claimant did receive substantial treatment for headaches during the relevant period, including neurology consults at the Cleveland Clinic and WVU Headache Center, a combination of medications, and one session of Botox injections. Moreover, the record documented that Claimant reported headaches before his alleged onset of disability and stated that they became more severe, which caused him to quit his job in October 2013. (Tr. at 529). However, as cited by the ALJ, Claimant left his job on his own volition and then sought other employment. The record did not corroborate that Claimant's headaches and associated symptoms interfered with his work performance, or that he was terminated, asked to resign, or suffered employment-related sanctions. In January 2014, Claimant reported having nine severe headaches per month for which he took Imitrex, yet conceded that the medication provided significant relief for his symptoms. (Tr. at 592). Claimant stated later that year, in November 2014, that he recently had a particularly severe headache, which caused him to feel nauseous to the point of vomiting, but when he took Imitrex, the symptoms were reduced. (Tr. at 662). In 2015 and 2016, Claimant was repeatedly noted to be "feeling well" with no headache and no complaints of double vision, nausea, vomiting, dizziness, or weakness. (Tr. at 677, 696, 700, 714, 718). During his visit in April 2016 with Dr. Watson, Claimant stated that Imitrex tablets dulled his "small headaches" so that he could function, and when he used the Imitrex injections for his severe headaches, the pain was completely eliminated. (Tr. at 707). Claimant denied any side effects from medications. His diagnosis was intractable chronic migraine *without* aura and *without* status migrainosus. (Tr. at 708). Dr. Watson confirmed in October 2016 that Claimant's response to abortive medications was good. (Tr. at 731). In November 2016, Claimant

again denied having any associated symptoms with his headache, such as vision issues, dizziness, vomiting, weakness, or other neurological complaints. (Tr. at 751).

Further, as the ALJ concluded, Claimant's daily activities were not impacted by his headaches to such an extent that he was rendered presumptively disabled under section 11.00 of the Listing. During the relevant period, Claimant cared for his five minor children;  in fact, he was the primary caretaker of two of those children when tone was an infant and the other was a toddler. (Tr. at 238, 605). He also cared for his school-aged children before and after school, and helped them with their homework. Claimant performed household chores, drove, went grocery shopping, managed money without difficulty, and attended to his own daily needs. (*Id.*). He enjoyed watching television and playing outside with his children. (*Id.*). Therefore, despite Claimant's numerous allegations regarding the pain and symptoms associated with his migraine headaches, there is substantial support for the ALJ's finding that Claimant did not have the neurological symptoms intrinsic to Listing 11.00 *et seq.*; as such, his migraine headaches simply did not meet or equal the severity of any listed impairment. Although the ALJ did not spell out that he considered Listing 11.03, the ALJ unequivocally compared Claimant's headaches to the criteria of that listing, focusing particularly on Claimant's ability to maintain normal daily activities. Moreover, the ALJ analyzed and discussed in detail the evidence that was pertinent to Listing 11.03, and his reasoning for concluding that Claimant did meet such listing is clear from the face of the decision.

Therefore, the undersigned **FINDS** that the ALJ's step three finding regarding Claimant's migraine headaches complied with applicable law and was supported by substantial evidence.

### B. Pain and Credibility Analysis

Claimant also challenges the ALJ's analysis of his pain and credibility, arguing that the ALJ relied "almost exclusively on objective evidence to discredit [his] allegations of disabling pain" from headaches. (ECF No. 10 at 8). Claimant cites the undersigned's recent discussion in *Eden v. Berryhill* in which the undersigned found that the ALJ failed to consider the nuances associated with migraine headaches in assessing the claimant's pain and credibility. (*Id.* at 10-11); *see Eden v. Berryhill*, No. 2:16-CV-03703, 2017 WL 1404380, at *19 (S.D.W. Va. Mar. 28, 2017), *report and recommendation adopted,* 2017 WL 1398341 (S.D.W. Va. Apr. 18, 2017). Claimant notes that, as the undersigned emphasized in *Eden*, migraines are not detectable in laboratory testing unlike many conditions; as such, an absence of objective evidence of migraines is not determinative. (*Id.*). Claimant contends that like the ALJ in *Eden*, the ALJ here did not provide any analysis to support the conclusion that Claimant's statements were inconsistent with the medical evidence. He adds that the ALJ did not properly evaluate all of the factors that he was required to consider under SSR 96-7p. (*Id.* at 11).

Under the Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996

WL 374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit stated that:

31

> Although a claimant's allegations about her pain may not be discredited
> solely because they are not substantiated by objective evidence of the
> pain itself or its severity, they need not be accepted to the extent they are
> inconsistent with the available evidence, including objective evidence of
> the underlying impairment, and the extent to which that impairment can
> reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Thus, while the ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations, the lack of objective medical evidence is one factor that may be considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

SSR 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in

the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ scrutinized Claimant's allegations of his symptoms using the two-step process required by the regulations. The ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. at 26). However, the ALJ found that Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (*Id.*). As noted above, the ALJ considered Claimant's voluntarily resignation from employment, followed by his attempt to find another job. The ALJ reviewed the variety of daily activities engaged in by Claimant, stressing the taxing physical and emotional demands of caring for five young children while his spouse worked. The ALJ noted that despite Claimant's subjective complaints to his medical providers, he was repeatedly observed to be in no acute distress at his medical appointments, with no neurological deficits, and his headaches were noted to be controlled on medication. (Tr. at 26-29). Therefore, the ALJ found that while Claimant received significant

treatment for headaches, the evidence as a whole did not corroborate his extreme allegations. (*Id.*). This case is readily distinguishable from *Eden* and other similar cases in which an ALJ improperly relied on the lack of objective evidence to discount a claimant's subjective complaints regarding headaches. *See, e.g., Moss v. Berryhill*, No. 2:16-CV-05016, 2017 WL 4296637, at *21 (S.D.W. Va. Apr. 27, 2017), *report and recommendation adopted,* No. 2:16-CV-05016, 2017 WL 4294206 (S.D.W. Va. Sept. 27, 2017) (The ALJ incorrectly discounted the claimant's credibility on the basis that she complained of migraine headaches even though her brain MRI was normal); *Harrington v. Colvin*, No. 7:15-CV-00020-FL, 2016 WL 320144, at *4 (E.D.N.C. Jan. 4, 2016), *report and recommendation adopted,* No. 7:15-CV-20-FL, 2016 WL 311284 (E.D.N.C. Jan. 25, 2016) (The ALJ's reliance on the unremarkable results of the brain CT scan and lack of objective evidence was improper).

Contrary to Claimant's assertion, the ALJ did not focus on the lack of objective evidence to discredit Claimant's allegations of disabling pain from headaches. Rather, the ALJ carefully reviewed Claimant's allegations, medical treatment, daily activities, and the opinion evidence. Ultimately, after performing his duty of analyzing and weighing the evidence, the ALJ concluded that Claimant was not as limited as he alleged. As shown above, the ALJ provided clear reasons, supported by the record, for his assessment that Claimant's statements were not fully credible. The ALJ did not address the credibility issue in a conclusory fashion, nor did the ALJ impermissibly find Claimant's representations to be less than fully reliable solely because there was no objective evidence to support Claimant's statements. Instead, the ALJ analyzed the record and found that notwithstanding Claimant's headaches, he maintained a spectrum of daily activities, and his symptoms were responsive to treatment. Claimant

required no emergency intervention and was repeatedly documented to be in no acute distress at his medical appointments. As previously stated, the Court's role is not to re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. The Court must only review the evidence to determine if it is sufficient to support the ALJ's conclusions. In this case, the undersigned **FINDS** that the ALJ's pain and credibility analysis was properly conducted in compliance with the applicable mandates, and his determination was supported by substantial evidence.

### C. RFC Analysis and Finding

Finally, the undersigned considers Claimant's argument that the ALJ declined to impose any limitations in his RFC related to his "obvious absenteeism or the need for additional rest breaks" that would result from his migraine headaches. (ECF No. 10 at 12).

Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ must assess include the claimant's

physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR §§ 404.1545(b-d), 416.945(b-d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review."

36

*Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

As discussed above, the ALJ thoroughly evaluated the credibility of Claimant's subjective complaints, the objective evidence, and the opinions concerning Claimant's headaches. No opinion was offered in this matter stating that Claimant would be absent from work or require rest breaks in excess of customary tolerances. Indeed, as noted by the ALJ, Claimant quit his job on his own volition and thereafter became the primary caregiver for five young children while his wife worked. Despite Claimant's alleged headaches and symptoms, he maintained his daily activities. At the administrative hearing, the ALJ questioned the vocational expert how any potential absenteeism would affect employability. (Tr. at 66-67). However, after considering and weighing all of the evidence, the ALJ ultimately concluded that no additional restrictions were warranted in Claimant's RFC. (Tr. at 24-31). Claimant does not point to evidence which the ALJ overlooked, but instead asks the Court to reevaluate Claimant's credibility and reassess Claimant's RFC, which is not the Court's role in reviewing the Commissioner's decision.

"Under the Social Security Act, [a reviewing court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." *Vest*, 2016 WL 5334668, at *2 (quoting *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001)) (alteration in original); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...."). The Court should not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary" and, if "conflicting evidence allows reasonable

37

minds to differ as to whether a claimant is disabled," the Court must defer to the Commissioner's decision. *Id.* (citations omitted).

The ALJ's decision demonstrates that the ALJ properly evaluated Claimant's allegations, medical treatment, and evaluations. The ALJ articulated support for the determination that is rooted in the record and consistent with the applicable rules and regulations. Therefore, for all of the reasons stated above, the undersigned **FINDS** that the ALJ's assessment of Claimant's headaches and the RFC finding is supported by substantial evidence.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 11); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is

made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: April 25, 2018

Cheryl A. Eifert
United States Magistrate Judge